The first is No. 23-1689, U.S. Well Services, LLC v. Stewart. Mr. Dowd. Good morning, Your Honors. May it please the Court. If I may, I'd like to start and jump right to the point with the Coley reference and the obviousness determination by the Board in this case. And if I could direct the Court's attention to the key aspect of that prior art reference, which we believe shows the Board's error. And this is at Appendix 684, and it's Paragraph 69 in the Coley reference. 684? Yes, Your Honor. So Paragraph 69 is in the upper right-hand column. And so just to give preface, the premise of Halliburton's obviousness argument and the Board's decision was that one of ordinary skill in the art would have started with Coley and then added a reference to add the monitoring pressure limitation. But our point has always been that when you read the Coley reference, it provides a description that obviates any need for monitoring pressure in a well fracturing system. And the sentence is, by extrapolating a maximum current value from this input, electric motor does not have the available power to exceed its operating pressure. So that disclosure, one of the skill in the art would understand that whatever else Coley is describing is describing an electric-powered fracturing system that has a procedure that obviates any need to monitor pressure in the well fracturing system. But Counselor, in order to determine and to set the available power to ensure that that available power does not exceed its operating pressure, why isn't that monitoring pressure? Because in our invention, monitoring pressure is the act of actually measuring the pressure in the operating well in the fluid. This is a fundamentally different approach, and it takes a different tact at perhaps solving a similar solution in terms of avoiding the overpressure. And Coley actually talks about that in paragraph 68 on the bottom of that page, where it's talking about a more conventional approach, which is in fact what we're doing, or was contemplated in our patent, in terms of going out, monitoring pressure, get the feedback of the pressure of the fluid, and then adjusting as necessary. But Coley takes a fundamentally different approach, and what I'd say is that the error in the board's position and decision, and the error with Halliburton's position on this, is that their expert never addressed this aspect of the disclosure. Not once does their expert, Assani, describe or address or explain how the idea of adding a pressure monitoring aspect of it, from say, Birch or Dykstra, is in direct conflict with the teaching of Coley. And with that, you never have any motivation to combine the references, and you're sitting at a position where you're starting with a flawed fundamental reference. And from our position, as the patent owner in a PTAB case, we're faced with a petition, and we are addressing the argument advanced by the petitioner. Now, the petitioner in this case, through their expert... You agree that Dykstra shows monitoring pressure, right? Correct, Your Honor. We agree with that. We have several disagreements in terms of whether a person of ordinary skill and art would combine Dykstra with Coley, but the most fundamental aspect is that because Coley is teaching something so fundamentally different, you don't have any motivation to add a pressure monitoring limitation. It expressly says that it avoids any possibility of an overpressure. The power is not available, and this goes to the way these systems operate. And with an electrically powered fracking system... What's the disadvantage to monitoring pressure? Pardon, Your Honor? What's the disadvantage to monitoring pressure? There are disadvantages and advantages. What's the disadvantage? According to Coley, you don't have the ability to always avoid the overpressure. With our system, the idea and the concept is that there's a feedback system and you're monitoring and you're adjusting on the fly. Well, but look, excess pressure is bad. Yes, Your Honor. And so why, as the board found, isn't there a reason to monitor pressure even if you have this current regulation? There's a reason to monitor pressure, and that's disclosed in our patent. But when you start with Halliburton's petition, the way they framed the obviousness question, they said you start with Coley, and one of skill and the art would have a reason to modify Coley. Our position, and their expert never addressed it directly, is that no, you don't have a reason to modify Coley because Coley approaches it a fundamentally different way. It solves the, I admit, it solves the overpressure problem in fracking systems, but it does so in the way that avoids any active monitoring and feedback back and forth in terms of the pressure fluid. And again... I mean, belt and suspenders is a pretty common approach when you're worried about something that could have adverse consequences. So the fact that you have a belt doesn't necessarily mean that you would eliminate suspenders. Judge, I posit it as that, yes, you could always do a belt and suspenders approach, and I think we tried to address that in our brief, not in those words. But when you start adding aspects to a complicated electric-powered fracking system, then there are consequences. There are costs. There are other issues. But more fundamentally, that wasn't really the emphasis of the petition. The petition was, and the basis of the petition, was that Coley expressly discloses and suggests monitoring pressure the same way that we do. And our point has always been that when you look at that disclosure, particularly paragraph 69, it tells one of skill in the art, no, you don't need to monitor pressure because we are going to set the electrical power system, and this is through the VFD that transmits the power, the electrical power to the motors. We're going to set it in a way that avoids any possibility of overpressure. The available power is not, the power is just not available. And that's what I have a hard time understanding of your argument as to why that is not monitoring the pressure, operating pressure. Wouldn't you agree that Coley teaches setting a maximum amount of power that can be sent to an electric motor? Yes, Judge Rainey, yes. A maximum amount of power, yes. So it seems to me that to do that, to set the maximum amount of power, you have to understand the power that's already been sent to the motors. That's the electrical power, Your Honor, not the fluid pressure in the pumps and the fracking fluid. Okay, I'm talking about the electrical power. Your view here, the two different expressions of your view is that with Coley, you can set the system and walk away. Correct, Your Honor. Whereas with the pen that we're looking at, you don't walk away. Somebody's monitoring continuously. Yes, Your Honor, and that's the fundamental point of the U.S. Wells patent is that there's a central monitoring system and you're getting constant feedback back and forth. There may be two different ways to monitor a system, but in the long run, it's still just monitoring the system. One way or the other, it's monitoring the system. Judge Rainey, I agree with you. It's monitoring the system overall, but it's not monitoring the pressure. And let me touch on another point as well, too, which I think highlights the inconsistency in Halliburton's argument and the board's decision, is that there are two aspects of the limitation. One is monitoring pressure of the electric generators and one's monitoring pressure of the pumps. Now, on one hand, they say, and they point to, I believe it's paragraph 72, that Coley describes monitoring any and every aspect of the system. But that argument is inconsistent with their fundamental approach of having to bring in another reference, Birch, which is apparently directed to monitoring the pressure of the gas in the generator. So if you were to accept the board's premise and Halliburton's argument that Coley by itself discloses, quote, monitoring all aspects of the system, then there's no reason to bring in any other reference. But this only brings, it's a little circular because it brings us back to paragraph 69. And if I may, Your Honor, even if the court accepts the board's argument, we still have fundamental issues with how the board treated the evidence of secondary considerations. And if I could turn to that for a few minutes. There, as we said in our brief, we think there is an inherent inconsistency in the court's case law in how it treats nexus. And what we did, we took the approach that's set forth in the WBPI case, where if we show that it's an embodiment of the claimed invention, that establishes nexus. And if you go back to one of the earliest nexus cases, Damaco, it describes the nexus analysis as a procedure of shifting the burden of production. And we took an approach where we satisfied our burden of production for producing evidence of secondary considerations to overcome any prima facie obviousness case. And that should have shifted the burden to Halliburton. You're saying you established nexus? Yes. Two things, Your Honor. We established a presumption of nexus because our commercial embodiment, the clean fleet, is an embodiment of the claimed invention. I'm not sure that your evidence showed that. I've read declarations that you're relying on. It seems to me they're pretty fuzzy about that. I would push back a little bit, Your Honor, on the fuzzy characterization. The one point that the board identified was the board claimed that we didn't show that our data van does pressure monitoring. But then if you look at Appendix 2212, and 2212 is one of U.S. Well Services brochures describing the clean fleet product, which we contend is an embodiment of the invention. And what the board concluded was, well, concluded two things. It dismissed this evidence. Where does this show pressure? So on 2212, let's see. One, two, three. The fourth line, if we start on the right-hand side, this is analog communications with pressure transducers. That aspect, which our expert highlighted in his declaration, was never addressed by the board. I don't know what that means. I don't know what that means, pressure monitoring or not. Oh, transducers is a standard mechanical or electrical device for measuring the pressure. And there's never any dispute about that. The other side, Halliburton never disputed this, never challenged this. Their expert never challenged this. And this is another critical point here. Halliburton's expert provided no opinion about the secondary consideration evidence. You say analog communications with pressure transducers means monitoring pressure? Yes, Your Honor. There's no dispute about that. Your witness doesn't say that. No, Your Honor, he does because... Where does he say that? So if we turn to 2429... And this is his chart that he provided. On the left-hand side of the column, we have the relevant limitation where it says monitor at least one of pressure and temperature of the plurality of electric pumps and the plurality of generators. And the second, the first paragraph, he starts off with the clean fleet data van, which is our commercial embodiment. And then he goes to, for example, the data van's centralized control unit, and he continues to monitor and the penultimate line in that paragraph cites and quotes pressure transducers. And he is explicitly saying that that limitation, that disclosure, lines up with our limitation in the claim. Halliburton never challenged it. Halliburton never disputed it. The Board never addressed it. And so we're left with the position where we presented this evidence to actually show nexus even beyond presumption. Well, the Board did say that you hadn't established that the device includes all of the claim limitations. Well, correct, Your Honor, and I believe that's Appendix 52 or 53. So the bottom paragraph of Appendix 53, patent owner has also not satisfied his burden to establish nexus absent of presumption. And first, they question the reliance on our own exhibits, claiming that, quote, they're not objective evidence. And then second, the Board continues and claims that we didn't show that there's a pressure monitoring element, but 2212 expressly does. And I see him into my... All right, we'll give you two minutes. Thank you. Well... Mr. Shahjahan. Good morning, and may it please the Court. The Board's decision should be affirmed because substantial evidence supports the Board's findings about the disclosures in Cali. And second, Your Honors, the Board committed no legal error and followed longstanding case law when it determined that U.S. Well failed to establish a presumption of nexus. Turning to the... the question on nexus and this issue of whether or not the Clean Fleet product was an embodiment, the claims require specific monitoring, the monitoring of pressure and temperature of the generators and the pumps. The Board noted that the brochure Mr. Dowd pointed the Court to mentions data monitoring. It doesn't mention which data is monitored and that it's the data required by the claims. Mr. Dowd points to a disclosure about pressure transducers, but there's no disclosure whether or not those transducers are tied to the equipment that the claims require, namely the pumps and the generators. So the Board had substantial basis to find a failure to show that the Clean Fleet product was an embodiment. Mr. Dowd also raises issues about supposed inconsistencies in the case law because he points to the Fox Factory case and says that it's inconsistent because it requires the commercial product to be an embodiment and also to be coextensive or commensurate with the claims and U.S. Well argues that that's inconsistent with the Demico case from 1988, but it's not. That case also articulated the coextensiveness requirement that's on 851 F. 2nd, page 1392, where the court explained that when the thing that's being sold isn't coextensive, then the patentee has to make a showing of actual nexus. It has to make a prima facie showing of a legally sufficient connection. So the coextensiveness requirement has been in the case law from the beginning and there's no inconsistency in the Fox Factory case. Turning to the board's finding on the disclosures in Colley. The board found Colley to disclose a control system that is coupled to and that monitors the pressure of the pumps. That finding was based on the explicit disclosures. So your friends on the other side are you inherently can you address that issue? Sure. The board didn't rely on inherency or make an inherency finding. The board's findings were grounded in explicit disclosures in the Colley reference and in expert testimony about what those disclosures mean, what they tell persons of ordinary skill in the art. If we look to the disclosures, paragraph 69 of Colley, which we were just discussing, that's on page 684. It discloses that a maximum pressure value is set at the beginning of the operation. So maximum pressure is a preset parameter in the Colley system and paragraph 72 It's the only parameter. There's no monitoring of the system under Colley, right? In paragraph 72 Colley mentions computer monitoring for the entire operation which facilitates the adherence to preset safety parameters. So these explicit disclosures teach monitoring for preset parameters and they teach that maximum pressure is a preset parameter. We don't even need to reach that though since Dijkstra discloses pressure monitoring. Exactly. There's no dispute that Dijkstra discloses pressure monitoring. The arguments made against the Dijkstra grounds in the briefing and by Mr. Dowd weren't made to the board. So yes, you're right. That issue doesn't need to be reached. The other issue that doesn't need to be reached is the Nexus issue because the board made an alternative analysis on appendix page 55. 55 of its decision proceeded to look at the evidence assuming Nexus had been established and found the evidence to be unpersuasive to establish commercial success or praise. And the board had substantial basis to make that determination to weigh the evidence and exercise its discretion. The evidence on commercial success lacked context and lacked support and it came from witnesses who were U.S. Well employees and named inventors and therefore had an interest in the validity of the patent. So the board's decision should be affirmed because substantial evidence supports the findings on the disclosures in Collie and the reasons to combine the references and the board's Nexus determination was legally correct and sound. So unless the court has any other questions we have nothing further. Can you comment briefly on the evidence that was submitted on secondary considerations? Sure. The brochures and Sure. The evidence on commercial success was it came in the form of witness testimony from Mr. Broussard who is the CEO of U.S. Well and a named inventor and there was also evidence about licensing. The board considered the commercial success evidence, the witness testimony it didn't dismiss it out of hand it noted that that this declarant was a U.S. Well employee and a named inventor so it looked at what Mr. Broussard said. On commercial success he mentioned a 22 percent correlation. It is a little troubling that they referred to the testimony of the employees as sort of biased and doesn't constitute objective evidence. I mean it perhaps could be discounted on that ground but I think perhaps the board went a little bit overboard in dismissing it. Well the board didn't dismiss it out of hand. The board looked at what Mr. Broussard said it looked at what he cited and then on appendix page 57 it said after weighing it and looking at what he says and what he cites we find it to be unpersuasive to establish commercial success. To what extent was commercial data submitted to prove commercial success? Was there change in price, loss of market share, things of that nature? Are you asking what the evidence from U.S. Well was of commercial success? It was of a supposed growth rate in U.S. Well's sales but the board looked at where this allegation came from. It came from Mr. Broussard and I looked at what he cited. He cited the file history for the 410 patent the board looked at that and said I see the statement of a 22% growth rate there also but there's no citation, there's no support so therefore it's insufficient support for Mr. Broussard's statement. Mr. Broussard also cited to a declaration of a Mr. O'Ring who was another U.S. Well employee. The board looked at that declaration and said Mr. O'Ring, he never spoke to the 22% growth rate issue at all so that wasn't support for Mr. Broussard either. So it didn't dismiss Mr. Broussard's testimony just because he was an interested witness it looked at what he said and what he cited and found it to be unpersuasive. On the licensing evidence the board looked at what that was that was also Mr. Broussard's testimony that was a press release about a license. The board looked at what they said. They said that the clean fleet technology was licensed but it didn't say one way or another what technology that was, what patents that covered. Mr. Broussard's statement is on page 1182 of the appendix in paragraph 12 and the press release is on page 1151 of the appendix and both failed to provide the detail that would have been needed to establish that as persuasive licensing evidence. The board noted other shortcomings in the commercial success evidence. The failure to define the relevant market and the failure to provide sales figures. That was on page 58 of the board's decision. So the board looked at the totality of the evidence, weighed it, performed its role as a fact finder and found the evidence to be unpersuasive and there was no abuse of discretion there so that determination should be affirmed. Okay, thank you. Okay, thank you very much. Mr. Dowd, you have two minutes. Thank you, Your Honor. If I could just quickly talk about one piece of the commercial success evidence and this is that appendix 0057 and the board completely dismissed our evidence of licensing because it applied the best evidence rule. We explained it in the brief. But your licensing evidence didn't tie it to the patent. Your Honor, it tied it generally to this technology and there is no dispute from the other side and this is a fundamental concern that I have. If you look at 1180, this is Bruce Hard's testimony. He says the commercial success of the Clean Feet product and technology is due to the addition of the all electric motors and electric pumps. That is not the patent. He himself is tying it more generally to something which isn't patented. It's a commercial embodiment of the claimed invention at issue here and while his testimony could have been more specific, it's undisputed. It's unchallenged as a factual matter and that's a concern when I look at how the board treated the secondary consideration evidence. It dismissed O-Rings and Bruce Hard's testimony essentially because they were so-called unbiased witnesses. That's a completely improper approach. If that were the approach, a patent owner would almost always never have the opportunity to have their own witness or experts or individuals who are most knowledgeable about the testimony testify about it. That happens every day in district court and there are multiple errors about the way the board treated the secondary considerations and ultimately, Your Honor, if you're not persuaded by my arguments today and what we put in the brief, at a minimum I think there's a word of caution about how the board treated and dismissed our secondary considerations evidence. Sure, perhaps it could have been tied more specifically. Perhaps there could have been more information included. It's always the case, but when we're in a situation where the other side the patent challenger doesn't produce any evidence, that brings us back to DeMacco where it's a burden shifting issue and the patent challenger has to come forth with evidence, not attorney argument. Thank you, Your Honor. Thank you, Mr. Dabb. Thank both counsel.